PLACEK v CITY OF STERLING HEIGHTS

Docket No. 59710. Argued May 2, 1978 (Calendar No. 1).—Decided February 8, 1979. Rehearing denied 406 Mich 1119.

Patricia and Joseph R. Placek brought an action for damages arising out of an automobile accident against the City of Sterling Heights and a city police officer, Richard M. Ernst. The police officer was driving a patrol car on an emergency run on Schoenherr through the intersection of Plumbrook and Schoenherr without stopping for a stop sign at Plumbrook, a through street, and struck Mrs. Placek's car as it traveled through the intersection on Plumbrook. A car driven by Cabell Woods was in front of Mrs. Placek on Plumbrook and was making a right turn onto Schoenherr when the plaintiffs' and the defendants' cars approached the intersection. Defendant Ernst testified that he did not see Mrs. Placek's car, although he did see Woods' car. Mrs. Placek testified that she did not hear the police car's siren and became aware of the flashing blue lights only at the

REFERENCES FOR POINTS IN HEADNOTES

[1] 57 Am Jur 2d, Negligence §§ 442-445.

[2] 15A Am Jur 2d, Common Law §§ 3, 5, 13-18.

[3] 57 Am Jur 2d, Negligence § 426 et seq.

[4] 57 Am Jur 2d, Negligence § 426.
   The doctrine of comparative negligence and its relation to the doctrine of contributory negligence. 32 ALR3d 463.

[5] 15A Am Jur 2d, Common Law §§ 16, 17.

[6-9, 24] 7 Am Jur 2d, Automobiles and Highway Traffic §§ 357, 358.
   8 Am Jur 2d, Automobiles and Highway Traffic §§ 754-757.
   57 Am Jur 2d, Negligence §§ 66, 90-93, 334, 335.
   Liability for personal injury or damage from operation of fire department vehicle. 82 ALR2d 312.
   Liability arising from accidents involving police vehicles. 83 ALR2d 383.
   Liability for personal injury or property damage from operation of ambulance. 84 ALR2d 121.

[10-21] 57 Am Jur 2d, Negligence § 429.
   Retrospective application of state statute substituting rule of comparative negligence for that of contributory negligence. 37 ALR3d 1438.

[22, 23] 7 Am Jur 2d, Automobiles and Highway Traffic §§ 353-360.

moment of impact. The plaintiffs argue that Mrs. Placek had a right to rely on the stop sign, that the defendant police officer disregarded the traffic traveling across his path, and that the doctrine of comparative negligence ought to be adopted to mitigate the harshness of the rule of contributory negligence. A jury in Macomb Circuit Court, Howard R. Carroll, J., returned a verdict of no cause of action. The Court of Appeals, V. J. Brennan, P.J., and Bronson and Carland, JJ., reversed and remanded for a new trial on another issue (Docket No. 15735). 52 Mich App 619; 217 NW2d 900 (1974). A second trial, Howard R. Carroll, J., also resulted in a verdict of no cause of action. The Court of Appeals, V. J. Brennan, P.J., and J. H. Gillis and D. C. Riley, JJ., affirmed in a memorandum opinion (Docket No. 24667). Plaintiffs appeal. *Held:*

In the interest of justice for all litigants, the doctrine of comparative negligence replaces the doctrine of contributory negligence in Michigan. A plaintiff's recovery of damages for negligence must be reduced to the extent of the plaintiff's own negligent contribution to the injury. The standards of "pure" comparative negligence are to be applied in this case in a new trial and to other cases on a limited retroactive basis.

1. Both the Supreme Court and the Legislature have the constitutional power to change the common law. The precedent from other common-law jurisdictions discarding contributory negligence in favor of a more equitable system of comparative negligence is so compelling that the question before the remaining courts and legislatures is not whether, but when, how, and in what form to follow the lead.

2. The considerations favoring judicial adoption of comparative negligence rather than legislative enactment are compelling. 1) The Legislature's superior power of investigation does not outweigh the unique judicial experience and preoccupation on the question of contributory negligence. The quantitative data that exist on the impact of the doctrine of comparative negligence on insurance rates, and on the processing of claims by settlement or litigation, are at least as well available to judges as to legislators. The issue is pre-eminently a legal one, rather than a legislative one. 2) The comparative negligence statutes passed in other jurisdictions have left ancillary questions to the courts for future solution. Also, the courts may anticipate several of the most important of these questions and dispense with the need for future litigation. 3) The argument that the parties should be given time to prepare themselves for a change in the law has been satisfied because the bench and bar were put on notice by statements in earlier cases that

members of the Court then advocated adoption of the comparative negligence doctrine. Adoption by the Court of comparative negligence is consistent with the Court's responsibility to the jurisprudence of Michigan.

3. The doctrine of "pure" comparative negligence most nearly accomplishes the goal of a fair system of apportionment of damages according to the fault of the parties. This form of comparative negligence does not unjustly enrich anyone. It does not allow one at fault to recover for one's own fault because damages are reduced in proportion to the contribution of that person's negligence. The wrongdoer does not recover to the extent of his fault, but only to the extent of the fault of others. The "hybrid rule" which prevents recovery if the plaintiff's negligence exceeds 50% of the total fault is just as arbitrary as the contributory negligence rule which completely denies recovery. The hybrid rule does not eliminate contributory negligence, but merely lowers the barrier. Pure comparative negligence holds a person fully responsible for his acts to the extent to which they cause injury. That is justice.

4. Whether a decision which overrules the common law shall be applied retroactively or prospectively should be determined case by case. The Court's discretion in this determination is limited only by the juristic philosophy of the judges, their conceptions of law, its origin and nature. The decision is not a matter of law but a determination based on weighing the merits and demerits of each case. Consideration is to be given to applying a ruling prospectively whenever injustice or hardship will thereby be averted. The Court must take into account the total situation confronting it and seek a just and realistic solution of the problems occasioned by the change.

5. Affording limited retroactive effect to the rule of comparative negligence will not unjustly burden litigants. That is not to say that some liability will not be created where none existed before, but that fact is unrelated to the problem of detrimental reliance on prior decisions of the Court. Furthermore, since July, 1977, the bench and bar of this state have had clear notice that three justices of this Court were ready to adopt comparative negligence and that three others might be willing in another case. Many litigants have diligently raised the issue since then. If no retroactive application is accorded this decision, the fortuity that this case was the first to arrive at the Court would be the sole determinant of who would benefit from the fairer doctrine of comparative negligence. Therefore, the rule of pure comparative negligence is applicable to 1) this case and all appropriate cases in which trial commences after the

date of this opinion including those in which a retrial is to occur upon remand because of any other issue, 2) any case presently pending on appeal in which application of the doctrine was raised in the trial court and the issue preserved for appeal, and 3) any case commenced but not submitted to the trier of fact prior to the date of this decision, but in no case shall it apply unless there is an appropriate request by counsel prior to submission to the trier of fact.

6. Under the applicable traffic statutes it is clear that the defendant police officer, like the plaintiff driver, is not absolved of the duty to drive "with due regard for the safety of others". Neither driver, therefore, had an absolute right to proceed blindly. A favored driver traveling on a through street, as against an emergency vehicle, has a right to cross the intersection unless, by reasonable exercise of the senses of sight and hearing, he should have noticed or heard warning to the contrary. "Reasonable exercise" includes a duty to be fairly alert to potential dangers that may be readily seen or heard. The trial court in this case erroneously instructed the jury that a driver is "required to remain alert to hazards", which is discernibly different. Furthermore, the specific language under Michigan law in accord with the trial court's instruction that a reasonably alert driver on a favored street must keep a lookout in order to discover possible dangers is simultaneously tempered by other language. The trial court failed to temper its instruction to the jury in this case with the qualification that the plaintiff would have breached her duty to be fairly alert only if she should have noticed or heard the warning of the approaching emergency vehicle. The instructions given are erroneous because they unfairly represent the law as to the plaintiff's duties. On the whole they are unfairly and erroneously weighted against the plaintiffs.

7. The trial court also failed to instruct the jury on the statutory duty of the driver of an authorized emergency vehicle to drive with due regard for the safety of all persons using the highway. Although the plaintiff did not request such an instruction, the failure to give it magnifies the probable impact of the erroneous instruction given on the plaintiff driver's duties. The fact that the instructions to the jury do not sufficiently define defendant's duties is not a specific basis for this appeal but ought to be noted to preclude similar error and further prolongation of the litigation.

8. The trial court properly denied the plaintiffs' motion for a directed verdict on the issue of the defendant police officer's negligence. Although it is undisputed that the defendant police

officer did not observe the plaintiffs' vehicle, there remain questions of fact of the speed at which the defendant police officer was traveling and whether his failure to observe the plaintiffs' vehicle was negligent where he was confronted with another potential danger, the Woods' car which was making a right turn at the time of the accident.

Justice Kavanagh concurred in the decision of the Court but not in matter relating to new instructions to the jury in an appendix to the opinion.

Reversed and remanded for a new trial.

Chief Justice Coleman, joined by Justices Fitzgerald and Ryan, agreed that the Court should adopt a system of pure comparative negligence and that the issue of defendant Ernst's negligence is a question of fact to be decided by the jury, but disagreed on the question of retroactive application and on the finding of error in the instructions to the jury concerning the plaintiff's duty of care. They also approved of the appendix to the majority opinion.

1. The retroactive application of the comparative negligence standard is both unwieldy and inequitable. It may reasonably be expected to have an adverse effect upon the orderly adminis-tration of justice and to fall unfairly upon litigants and others.

2. The broad retroactive application is explained partially by the fact that the bench and bar knew, as of July, 1977, that three justices were ready to adopt the comparative negligence rule. However, because the Court was equally divided in the decision which announced that readiness, the effect of that decision was to retain the contributory negligence rule in accordance with the Court of Appeals opinion in that case. The bench and bar remained bound by the law. Therefore, the trial judge in this case committed no "error" to be preserved. The crucial determinant of the extent of application of an overrul-ing decision is the reliance placed upon the old rule. It would be unjust to deny the benefits of this decision to certain litigants who relied on the previous law of contributory negli-gence and settled their cases while granting the benefits to certain other litigants.

3. Adoption of the concept of comparative negligence by court rule and supporting Standard Jury Instructions, which would have been prospective in application, would have been prefera-ble because this is such a fundamental change in the law of torts. It would be fair to the most litigants and less disruptive to the administration of justice if the Court would provide that this fundamental change in the tort law be applied only in a prospective fashion, effective as to causes of action arising after

the date of the opinion. Such a decision would provide time for well considered and appropriate court rules and jury instructions to be drafted. It would provide adequate notice to attorneys in the preparation of their cases. Importantly, the already overburdened courts would not have to face unknown numbers of retrials of cases which were otherwise error-free or extensive motions for amended pleadings or other proceedings to complete trials which were commenced on a tort theory which is suddenly no longer in effect. Purely prospective application also would avoid the possible invalidation of various contracts made in reliance upon the former tort concepts. It would give the Legislature fair notice of the change.

4. The traditional notion that judges did not make the law but merely discovered it led to the conclusion that all overruling decisions were necessarily retroactive because the true rule, which had always been the law, was now discovered. Modern jurisprudence has abandoned this approach, recognized the obvious, and acknowledged that whenever a court overrules precedent it is functioning in a lawmaking capacity. Because in some instances considerations of convenience, of utility, and of the deepest sentiments of justice militate against the retroactive application of a new rule, the doctrine of prospective overruling has been forwarded to promote both stability and development in the law. In civil cases, prospective application is warranted primarily in instances, such as this case, where the overruling decision replaces a rule which has been in existence and generally used for many years.

5. One argument against prospective application is that litigants who believe that they will not receive the fruits of an overruling decision will have little incentive to seek needed developments in the law. The effective date of opinions is usually selected after weighing considerations of fairness, intent, the extent of reliance upon former law and the impact upon the legal and judicial systems. In some cases, constitutional considerations must be placed on the scales. The fact that an occasional case may be given prospective application in the interests of justice is not a deterrent to "creative" appeal. In the majority of cases decided by the Court, the appellant has received the benefit of the new law, and no change in this practice is anticipated. However, there will always be exceptional cases where drastic changes are made in the legal scheme, raising considerations of fairness which extend far beyond the appellant who raises them. Such extensive reliance has been placed upon existing law that legislation, common law, and rules of practice have been built upon the concept.

Removal of the foundation will cause the collapse of those other rules of law. It is unlikely that an occasional change of law which does not benefit the instant plaintiff or defendant will result in any less litigation. Also, there will always be individual litigants who will bear the cost of litigation because of the knowledge that their success or failure will have an effect upon their own interests far beyond the scope of the immediate litigation. Such litigants will be supported and supplanted by lawyers and law firms who often fund the cost of the litigation through contingent fee contracts. There is no basis for the assumption that a groundbreaking decision will always arise in the context of a single-issue appeal and, in fact, the appellants in this case sought reversal of the jury verdict on two other grounds.

6. The second argument raised against prospective application is that the Court's language has no binding effect because it is merely dictum. When the Court indicates clearly that a rule will be applied by it in future cases, it necessarily rises above the stature of *ordinary* dictum; from that time forward, no person would be justified in relying upon the old rule which the Court has repudiated. Clearly this objection to the prospective rule which does not apply to parties in the overruling case is grounded more on theoretical niceties than practicality.

7. It is difficult to imagine a decision of the Court which is more legislative than this one. Therefore, for all the reasons that legislation is made prospective, this decision should also be given prospective effect.

8. There was no reversible error in the trial court's instruction to the jury concerning the plaintiff driver's duty of care. The charge given fairly informed the jury of the plaintiff's rights and duties. The language used in this case is consistent with and supported by the law. A "favored" driver (one proceeding with the right of way) has a right to proceed unless he should have noticed a warning to the contrary. This statement and the challenged instructions in this case, however, are not mutually exclusive. The two are opposite sides of the same coin, one expressing the favored driver's right to proceed and the other expressing his constant duty of due care. Furthermore, the trial court fairly and fully informed the jury of defendant Ernst's common-law duty to drive as a reasonably careful person and his statutory duty to drive an emergency vehicle with due regard for the safety of all persons using the highway.

OPINION OF THE COURT

1. NEGLIGENCE — COMPARATIVE NEGLIGENCE — CONTRIBUTORY NEGLI-
GENCE — DAMAGES.

The doctrine of "pure" comparative negligence replaces the doc-
trine of contributory negligence in the interests of justice for
all litigants; a plaintiff's recovery of damages for negligence
must be reduced to the extent of the plaintiff's own negligent
contribution to the injury, but is not totally barred.

2. COMMON LAW — CONSTITUTIONAL LAW — COURTS — LEGISLATURE.

Both the Supreme Court and the Legislature have the constitu-
tional power to change the common law (Const 1963, art 3, § 7).

3. NEGLIGENCE — COMPARATIVE NEGLIGENCE — COMMON LAW —
COURTS.

Adoption of the doctrine of comparative negligence is consistent
with the Supreme Court's responsibility to the jurisprudence of
Michigan (Const 1963, art 3, § 7).

4. NEGLIGENCE — COMPARATIVE NEGLIGENCE — DAMAGES — APPOR-
TIONMENT.

The doctrine of "pure" comparative negligence, under which a
plaintiff's recovery of damages for negligence must be reduced
to the extent of the plaintiff's own negligent contribution to the
injury, most nearly accomplishes the goal of a fair system of
apportionment of damages because it distributes responsibility
according to the fault of the parties.

5. COMMON LAW — OVERRULING DECISION — RETROACTIVE APPLICA-
TION.

Whether a decision which overrules the common law should be
applied retroactively or prospectively is not a matter of law but
a determination based on weighing the merits and demerits of
each case; the Court's discretion in this determination is lim-
ited only by the juristic philosophy of its judges and their
conception of the law, its origin and nature, and it should seek
a just and realistic solution of the problems occasioned by the
change.

6. AUTOMOBILES — NEGLIGENCE — DUE CARE — EMERGENCY VEHICLES
— TRAFFIC SIGNALS.

A driver who has the right of way on a through street is not
absolved of the duty to exercise due care when proceeding
through an intersection where the other street is controlled by
a stop sign; he has the right, as against an emergency vehicle
crossing his path, to cross the intersection unless, by the
reasonable exercise of the senses of sight and hearing, the
driver on the through street should have noticed or heard a

warning to the contrary (MCL 257.603, 257.649[f], 257.653; MSA 9.2303, 9.2349[f], 9.2353).

7. Automobiles — Negligence — Due Care — Emergency Vehicles.

A driver of an authorized emergency vehicle is, by statute, not relieved of the duty to drive with due regard for the safety of others (MCL 257.603, 257.653; MSA 9.2303, 9.2353).

8. Automobiles — Negligence — Due Care — Emergency Vehicles — Traffic Signals — Instructions to Jury.

Instructions to the jury in a trial for automobile negligence that a plaintiff driver on a through street is required to remain alert to hazards on the highway and must keep a lookout in order to discover possible dangers, but which failed to contain the qualification that the driver would breach the duty to be fairly alert only if the driver should have noticed or heard the warning of an approaching emergency vehicle which crossed the driver's path without stopping for a stop sign on the cross street were reversibly erroneous because the instructions as a whole unfairly presented the law as to the plaintiff driver's duties (MCL 257.603, 257.649[f], 257.653; MSA 9.2303, 9.2349[f], 9.2353).

9. Automobiles — Negligence — Due Care — Emergency Vehicles — Traffic Signals — Question of Fact.

Denial of plaintiff's motion for a directed verdict on the issue of a defendant police officer's negligence in driving an authorized emergency vehicle across an intersection without stopping at a stop sign was proper, although it was undisputed that the police officer did not observe the plaintiff's vehicle which was traveling on the through street, where there remained questions of fact of the speed at which the defendant police officer was traveling and whether the failure to observe the plaintiff's vehicle was negligent because the police officer was confronted with the potential danger of another car making a right turn at the intersection (MCL 257.603, 257.653; MSA 9.2303, 9.2353).

Opinion Concurring in Part and Dissenting in Part by
Coleman, C.J.

10. Negligence — Comparative Negligence — Retroactive Application.

*The retroactive application of the comparative negligence stan-*

*dard is both unwieldy and inequitable; it may reasonably be expected to have an adverse effect upon the orderly administration of justice and to fall unfairly upon litigants and others.*

11. COMMON LAW — OVERRULING DECISION — RETROACTIVE APPLICATION — COMPARATIVE NEGLIGENCE.

*Broad retroactive application of the comparative negligence rule is explained partially by the fact that the bench and bar knew, as of July, 1977, that three justices were ready to adopt the comparative negligence rule; however, because the Supreme Court was equally divided in the decision which announced that readiness, the effect of the decision was to retain the contributory negligence rule, and the bench and bar remained bound by the law of contributory negligence.*

12. NEGLIGENCE — COMPARATIVE NEGLIGENCE — RETROACTIVE APPLICATION — COMMON LAW.

*Adoption of the concept of comparative negligence by court rule and supporting Standard Jury Instructions, which would have been prospective in application, would have been preferable to adoption by an overruling decision applied retroactively, because it is such a fundamental change in the law of torts; it would be fair to the most litigants and less disruptive to the administration of justice if the Court would provide that a fundamental change in tort law be applied only in a prospective fashion, effective as to causes of action arising after the date of the opinion.*

13. COMMON LAW — OVERRULING DECISION — RETROACTIVE APPLICATION.

*The traditional notion that judges did not make the law but merely discovered it led to the conclusion that all overruling decisions were necessarily retroactive because the true rule, which had always been the law, was now discovered; modern jurisprudence has abandoned this approach, recognized the obvious, and acknowledged that whenever a court overrules precedent it is functioning in a lawmaking capacity.*

14. COMMON LAW — OVERRULING DECISION — RETROACTIVE APPLICATION.

*The doctrine of prospective overruling has been forwarded to promote both stability and development in the law, because in some instances considerations of convenience, of utility, and of the deepest sentiments of justice militate against the retroactive application of a new rule.*

15. COMMON LAW — OVERRULING DECISION — PROSPECTIVE APPLICA-
TION — COMPARATIVE NEGLIGENCE.

*Prospective application of an overruling decision in a civil case is
warranted primarily in instances, such as the case announcing
the rule of comparative negligence, where the overruling deci-
sion replaces a rule which has been in existence and generally
used for many years.*

16. COMMON LAW — OVERRULING DECISION — RETROACTIVE APPLICA-
TION.

*The crucial determinant of the extent of application of an over-
ruling decision is the reliance placed upon the old rule.*

17. NEGLIGENCE — COMPARATIVE NEGLIGENCE — RETROACTIVE APPLI-
CATION.

*It would be unjust to deny the benefits of comparative negligence
by an overruling decision to certain litigants who relied on the
previous law of contributory negligence and settled their cases
while granting the benefits to certain other litigants.*

18. COMMON LAW — OVERRULING DECISIONS — EFFECTIVE DATE.

*The effective date of opinions is usually selected after weighing
considerations of fairness and intent, the extent of reliance
upon former law and the impact upon the legal and judicial
systems; in some cases, constitutional considerations must be
placed on the scales.*

19. COMMON LAW — OVERRULING DECISIONS — EFFECTIVE DATE.

*The fact that an occasional case may be given prospective appli-
cation in the interests of justice is not a deterrent to "creative"
appeal; in the majority of cases decided by the Supreme Court,
the appellant has received the benefit of the new law, and no
change in this practice is anticipated.*

20. COMMON LAW — DICTUM — OVERRULING DECISION.

*When the Court indicates clearly that a rule will be applied by it
in future cases, it necessarily rises above the stature of ordi-
nary dictum; from that time forward, no person would be
justified in relying upon the old rule which the Court has
repudiated.*

21. NEGLIGENCE — COMPARATIVE NEGLIGENCE — COMMON LAW —
OVERRULING DECISION.

*It is difficult to imagine a decision of the Supreme Court which is
more legislative than the one which announced the rule of
comparative negligence; therefore, for all the reasons that*

*legislation is made prospective, that decision should be given prospective effect.*

22. AUTOMOBILES — NEGLIGENCE — DUE CARE — INSTRUCTIONS TO JURY.

*There was no reversible error in a trial court's instruction to the jury concerning a plaintiff driver's duty of care where the charge given fairly informed the jury of the plaintiff's rights and duties, and the language used was consistent with and supported by the law.*

23. AUTOMOBILES — NEGLIGENCE — DUE CARE — TRAFFIC SIGNALS.

*A "favored" driver (one proceeding with the right of way) has a right to proceed unless he should have noticed a warning to the contrary; however, his right to proceed and his constant duty of due care are not mutually exclusive, but are opposite sides of the same coin (MCL 257.649[f]; MSA 9.2349[f]).*

24. AUTOMOBILES — NEGLIGENCE — DUE CARE — EMERGENCY VEHICLES.

*The driver of an authorized emergency vehicle has a common-law duty to drive as a reasonably careful person and a statutory duty to drive an emergency vehicle with due regard for the safety of all persons using the highway; instructions to the jury which fully and fairly informed the jury of these duties were not in error (MCL 257.603, 257.653; MSA 9.2303, 9.2353).*

*Lopatin, Miller, Bindes, Freedman & Bluestone* (by *Sheldon L. Miller* and *Michael Gagleard)* for plaintiffs.

*Coticchio, Zotter & Sullivan, P.C. (Sommers, Schwartz, Silver & Schwartz, P.C.,* by *Richard D. Toth,* of counsel), for defendants.

Amici Curiae:

*Foster, Swift, Collins & Coey, P.C.* (by *David W. McKeague* and *James D. Adkins),* for American Insurance Association, Alliance of American Insurers, and National Association of Independent Insurers.

*Bodman, Longley & Dahling* (by *Theodore Souris*
and *James J. Walsh)* for State Farm Automobile
Insurance Company.

Williams, J. In this case we consider whether to
adopt a rule of comparative negligence in Michigan. The factual circumstances involve a close
question of the negligence of one or both of two
drivers: driver Placek, a layperson who was traveling on a through street and the other, Police
Officer Ernst on an emergency run traveling past
a stop sign. We do not sit as trier of fact as to
whether either, neither or both of these drivers
were negligent.

We hold, in the interest of justice for all litigants in this state, that the doctrine of comparative negligence hereby replaces the doctrine of
contributory negligence[1] and that the standards of
comparative negligence are to be applied by the
court on remand for new trial in the instant case
and on a limited retroactive basis.

## I. Facts

On April 8, 1970, plaintiff, Patricia Placek was
traveling east on Plumbrook, a two-lane highway,
at 30-35 miles per hour. It is uncontested that this
was the speed at which plaintiff was traveling and
that the posted speed limit was 35 miles per hour.

Plaintiff was following the car of Cabell and
Virginia Woods, also traveling east on Plumbrook.
As the Woods' car approached Schoenherr, the
driver of that vehicle slowed to execute a right-

---

[1] As a matter of terminology we replace the doctrine of contributory
negligence. In actuality, however, it is contributory negligence as a
*total* bar to recovery which is replaced. The effect of this action is to
establish contributory negligence as a partial bar to recovery by
insuring that any recovery of damages by a plaintiff be reduced to the
extent of his or her own negligent contribution to the injury.

hand turn. At this point Ms. Placek moved her vehicle into the left lane to go around the Woods' vehicle and pass through the Schoenherr intersection. She collided with the right side of the vehicle driven by Police Officer Ernst a little more than half way across Schoenherr. Ms. Placek testified that she had only become aware of the police vehicle when it was too late to avoid the collision.

Defendant Police Officer Ernst was traveling south on Schoenherr on an emergency run. As he approached the Plumbrook intersection, both his siren and flasher were in operation. Defendant testified that he was aware of the Woods' vehicle but did not see plaintiff's vehicle. Defendant further testified that he slowed down before he approached the Plumbrook intersection but had begun to speed up again as he entered the intersection. There is disputed testimony as to the speed at which defendant was traveling; defendant told Officer James Porter, the investigating officer at the scene of the accident, however, that he was traveling at 30 miles per hour.

Nothing at the intersection obstructed the view of either driver.

The only non-party witnesses to the accident were Cabell and Virginia Woods. As stated above, their vehicle was traveling east on Plumbrook in front of plaintiff's vehicle, and had begun execution of a right-hand turn onto Schoenherr. Virginia Woods, the passenger, noticed the approaching police car and called it to her husband's attention. Mr. Woods then brought his vehicle to a stop. Mr. Woods testified that he thought the police vehicle was traveling at 40 miles per hour. Ms. Woods testified that the officer was traveling faster than the posted 35 miles per hour speed limit.

Plaintiff originally filed suit against defendants

Ernst and the City of Sterling Heights on July 28, 1970. A trial was held in October, 1972, and resulted in a verdict of no cause of action against plaintiff. This verdict was reversed and remanded for new trial by the Court of Appeals on the basis that the trial court had erred in allowing plaintiff to be questioned as to whether she wore a seat belt. *Placek v Sterling Heights,* 52 Mich App 619; 217 NW2d 900 (1974). The second trial took place in May, 1975, and again resulted in a verdict of no cause of action against plaintiff. This verdict was affirmed by the Court of Appeals in an unpublished memorandum opinion. Leave to appeal was granted by this Court on November 23, 1977.

## II. Issues

We granted leave to appeal to consider three issues: (1) whether a comparative negligence standard should be adopted in this state, (2) whether the trial court's instruction as to plaintiff's duty of care was prejudicially erroneous and (3) whether reasonable minds can differ as to whether defendant Ernst was negligent.

## III. Comparative or Contributory Negligence

There is little dispute among legal commentators that the doctrine of contributory negligence has caused substantial injustice since it was first invoked in England in 1809.[2] Of significance in this regard is that almost every common-law jurisdiction outside the United States has discarded contributory negligence and has adopted in its place a

---

[2] *Butterfield v Forrester,* 11 East 60; 103 Eng Rep 926 (1809). The "checkered" history of the doctrine of contributory negligence is discussed in the Williams opinion in *Kirby v Larson,* 400 Mich 585, 613-623; 256 NW2d 400 (1977).

more equitable system of comparative negligence.[3]
Even in this country, considered the only remaining primary location employing contributory negligence,[4] 32 states and the United States Supreme Court in the case of admiralty law have discarded or rejected it in favor of some form of comparative negligence.[5] This precedent is so compelling that the question before remaining courts and legislatures is not whether but when, how and in what form to follow this lead. Therefore, to the properly raised question[6] of whether a comparative negli-

[3] Wade, *A Uniform Comparative Fault Act—What Should It Provide?*, 10 U of Mich J of L Reform 220, 221 (1977) (hereinafter cited as Wade).

[4] *Id.*

[5] *Pope & Talbot, Inc v Hawn,* 346 US 406, 408-409; 74 S Ct 202; 98 L Ed 143 (1953); Alaska, *Kaatz v State,* 540 P2d 1037 (Alas, 1975); Arkansas, Ark Stat Ann, §§ 27-1763 to 27-1765; California, *Li v Yellow Cab Co of California,* 13 Cal 3d 804; 532 P2d 1226; 119 Cal Rptr 858 (1975); Colorado, Colo Rev Stat, § 13-21-111; Connecticut, Conn Stat Ann, § 52-572h (Supp 1978); Florida, *Hoffman v Jones,* 280 So 2d 431 (Fla, 1973); Georgia, Ga Code Ann, § 105-603; Hawaii, Hawaii Rev Stat, § 663-31; Idaho, Idaho Code, §§ 6-801, 6-802 (Supp 1978); Kansas, Kan Stat Ann 60-258a; Maine, Me Rev Stat Ann, tit 14, § 156 (Supp 1978-1979); Massachusetts, Mass Gen Laws Ann, ch 231, § 85 (Supp 1978); Minnesota, Minn Stat Ann, § 604.01 (Supp 1978); Mississippi, Miss Code Ann, § 11-7-15; Montana, Rev Codes Mont, § 58-607.1 (Cum Supp 1977); Nebraska, Rev Stat Neb, § 25-1151; Neveda, Nev Rev Stat, § 41.141; New Hampshire, N H Rev Stat Ann 507:7-a (Supp 1977); New Jersey, N J Stat Ann 2A:15-5.1—2A:15-5.3 (Supp 1978-1979); New York, N Y Civ Prac, § 1411 (McKinney 1976); North Dakota, N D Cent Code, § 9-10-07; Oklahoma, Okla Stat Ann, tit 23, § 11 (Supp 1978-1979); Oregon, Ore Rev Stat 18.470; Pennsylvania, Pa Stat Ann, tit 17, §§ 2101, 2102 (Purdon, Supp 1978-1979); Rhode Island, R I Gen Laws, § 9-20-4 (Supp 1977); South Dakota, S D Comp Laws, § 20-9-2; Texas, Vernon's Tex Ann Civ Stat, art 2212a, § 1 (Supp 1978-1979); Utah, Utah Code Ann 78-27-37; Vermont, Vt Stat Ann, tit 12, § 1036; Washington, Rev Code Wash Ann 4.22.010 (Supp 1978); Wisconsin, Wis Stat Ann 895.045 (Supp 1978-1979); Wyoming, Wyo Stat, § 1-7.2(a) (Supp 1975).

Also, although South Carolina is not generally a comparative negligence state, the doctrine has been enacted on a limited basis for automobile negligence cases. S C Code, § 15-1-300.

[6] Defendants challenge whether comparative negligence was properly raised in the instant case. Plaintiffs apparently raised the issue for the first time during the second trial in this matter, in which the following exchange occurred:

"*Mr. Miller [plaintiff's attorney]:* For the record, I had another

gence standard should be substituted for contributory negligence in Michigan, we answer in the affirmative.[7]

In July, 1977, three Justices on this Court would have established comparative negligence as the

---

motion I wanted to take up, which was, I would move to strike Mr. Zotter's answers, or opening statement concerning the law on contributory negligence, as I would ask the court to apply comparative negligence in this case, and I would assume that would be rejected, but I would like to place it on the record and keep it there should it ever become necessary. That is what the law should be and this is a perfect case for it, Judge.

"*The Court:* Well—

"*Mr. Zotter:* I oppose it, your Honor.

"*The Court:* Even though I might agree with you I have to deny it."

Subsequent to jury instructions, plaintiff's counsel made the following objection:

"*The Court:* All right, gentlemen. Now you can protect yourself from here to there on the record.

"*Mr. Miller:* I would first object, your Honor, to the charge of contributory negligence. I requested a charge over comparative negligence which the court is aware of.

"*The Court:* Yes.

"*Mr. Miller:* That we can pass on, I assume. I hope it won't be necessary, but preserve it."

On appeal to the Court of Appeals, plaintiff raised the same three issues raised before this Court, including whether a comparative negligence system should be adopted in this state.

We find the issue properly raised and preserved for our consideration.

[7] There has been some discussion in legal literature regarding whether substitution of comparative negligence for contributory negligence is necessary in a state in which a no-fault insurance act is in effect. Schwartz, Comparative Negligence (Indianapolis: Allen Smith Co, 1974), § 1.6, pp 28-29; Sherman, *An Analysis of Pennsylvania's Comparative Negligence Statute,* 38 U Pittsburgh L Rev 51, 56-57 (1976). We agree with the conclusions reached by both authors that the existence of a no-fault act does not preclude the necessity for the substitution.

"Even in states that adopt a 'no-fault system,' comparative negligence can be an important part of the law for at least two reasons. First, the well-known no-fault plans apply only to motor vehicle cases. Cases involving slip and fall, product liability, or plane, boat, or train accidents will not be affected. Second, most no-fault plans that have proved of interest to legislators retain the fault system for damages exceeding specified limits." (Footnote omitted.) Schwartz, pp 28-29.

See discussion in the appendix to the WILLIAMS opinion in *Kirby,* 656-658.

rule in this state.[8] *Kirby v Larson,* 400 Mich 585; 256 NW2d 400 (1977), involved a factual situation typical of the potential injustice of the doctrine of contributory negligence.

In *Kirby,* a defendant, driving north, approached an intersection passing by a car also traveling north which had already come to a stop at the intersection for a changing light. Plaintiff Christine Kirby was a passenger in a car which had been proceeding south on the same street and was stopped at the intersection waiting to make a left-hand turn. Both Kirby and the driver saw the first vehicle come to a stop and anticipated that defendant, then about three or four car lengths back from the intersection, would do the same.

Plaintiff suggested completion of the turn to the driver, although there was some disputed testimony as to whether this suggestion was made after the driver was already turning the wheel of the car, and the driver proceeded to turn. Defendant's car, traveling at 25-30 miles per hour, struck the right rear of the car in which plaintiff was a passenger; plaintiff was thrown from the car and seriously injured.

The trial court instructed the jury on contributory negligence:

"'* * * if you find that Christine Kirby was personally and contributorily negligent and such negligence was a proximate cause of the injury and damages alleged by her and in that event Christine Kirby cannot recover from the defendant and your verdict therefore would be for the defendant." *Kirby, supra,* 595.

The jury returned a verdict in favor of defendant.

*Kirby* was heard at this Court by six Justices,[9]

---

[8] KAVANAGH, C.J., and WILLIAMS and LEVIN, JJ.

[9] Justice BLAIR MOODY, JR., did not participate.

and the ultimate disposition included two opinions, each one representing the views of three Justices. The WILLIAMS opinion in *Kirby* found in part III that instructional errors at the trial level required reversal and remand for new trial. Beyond this, through the WILLIAMS opinion, the Chief Justice, Justice LEVIN and Justice WILLIAMS would have adopted comparative negligence as a substitute for contributory negligence in Michigan and would have instituted that doctrine as prevailing on remand.

The three other participating Justices in *Kirby* concurred in part III of the WILLIAMS opinion, finding error below necessitating remand and a new trial. Justice FITZGERALD's opinion, however, signed by Justices COLEMAN and RYAN, did not find *Kirby* the appropriate vehicle for adopting comparative negligence. That opinion found the record before this Court inadequate because, unlike the instant case, the parties had not fully briefed and discussed the issue.

Because many aspects of comparative negligence were extensively dealt with in *Kirby,* only a brief review of certain of these is necessary. The sub-issues specifically discussed under headings "A", "B" and "C", *infra,* are those raised by the parties.

*A. Judicial Adoption of Comparative Negligence*

In part IX of the WILLIAMS opinion in *Kirby,* a brief analysis was made as to the propriety of judicial versus legislative abrogation of contributory negligence and adoption of comparative negligence.

There is no question that both this Court and the Legislature have the constitutional power to change the common law.

"The common law and the statute laws now in force,

not repugnant to this constitution, shall remain in force until they expire by their own limitations, or are changed, amended or repealed." Const 1963, art 3, § 7.

This provision has been construed to authorize both judicial change and legislative amendment or repeal. *Myers v Genesee County Auditor,* 375 Mich 1, 7; 133 NW2d 190 (1965).

Further, when dealing with judge-made law, this Court in the past has not disregarded its corrective responsibility in the proper case.

"[O]ur Court has heretofore believed that rules created by the court could be altered by the court. For example, we abrogated the defense of assumption of risk, *Felgner v Anderson,* 375 Mich 23; 133 NW2d 136 (1965), repudiated the doctrine of imputed negligence, *Bricker v Green,* 313 Mich 218; 21 NW2d 105 (1946), eliminated the privity requirement in actions for breach of an implied warranty, *Spence v Three Rivers Builders & Masonry Supply, Inc,* 353 Mich 120; 90 NW2d 873 (1958), overruled the common-law disability prohibiting the wife from suing for the loss of her husband's consortium, *Montgomery v Stephan,* 359 Mich 33; 101 NW2d 227 (1960), overruled the common-law disallowance of recovery for negligently inflicted prenatal injury, *Womack v Buchhorn,* 384 Mich 718, 724-725; 187 NW2d 218 (1971); and even eliminated charitable immunity from negligence, *Parker v Port Huron Hospital,* 361 Mich 1; 105 NW2d 1 (1960)." *Kirby,* 625.

The question then is whether a judicial forum is appropriate for adoption of comparative negligence.[10] In three of the states now employing comparative negligence, that rule was judicially

---

[10] This topic has occasioned much comment. See, *e.g.,* Fleming, *Foreword: Comparative Negligence at Last—By Judicial Choice,* 64 Calif L Rev 239, 241, 273-282 (1976); Am Jur 2d, New Topic Service, Comparative Negligence, § 7 (1977); Schwartz, Comparative Negligence, §§ 21.6, 21.7, pp 353-361; 78 ALR3d 421.

adopted: Alaska, *Kaatz v State,* 540 P2d 1037 (Alas, 1975); California, *Li v Yellow Cab Co of California,* 13 Cal 3d 804; 532 P2d 1226; 119 Cal Rptr 858 (1975); Florida, *Hoffman v Jones,* 280 So 2d 431 (Fla, 1973).

Points raised against such judicial action include the legislature's superior power of investigation and ability to handle collateral problems as well as the legislature's ability to pass statutes which come into effect at some future date thereby providing notice to the bench and bar of impending change.

However, considerations favoring judicial adoption rather than legislative are equally if not more compelling. Professor Fleming analyzes and ably disputes the three main points often asserted in favor of legislative adoption:

"First is the question which of these two bodies is better equipped to understand the nature and implications of the problem and to make an informed choice from available alternatives. It is fashionable to suppose that the investigatory opportunities of the legislature establish its superior credentials in this respect. * * * *But on the question of contributory negligence, one cannot very well dispute the unique judicial experience and preoccupation * * *.* Moreover, such quantitative data as exist on the impact of comparative negligence on insurance rates [see appendix in *Kirby,* p 651] and on the processing of claims by settlement or resort to court [see appendix in *Kirby,* p 648] are at least as well available to judges as to legislators. * * * Nor should one lightly indulge the fancy that because many legislators have enjoyed legal training, they are therefore as sensitive to the need for reform or as well equipped to pass an independent judgment on this issue as are the courts. In a nutshell, this is preeminently lawyer's law." (Emphasis added.) Fleming, *Foreword: Comparative Negligence at Last—By Judicial Choice,* 64 Calif L Rev 239, 279-280 (1976).

The next point analyzed by Professor Fleming is the assertion of the Legislature's superior ability to enact the primary change and simultaneously anticipate and resolve the numerous details and collateral issues at one time. Professor Fleming cites two points in response.

"First, almost all comparative negligence statutes are * * * in the briefest conceivable form and leave the very same ancillary questions likewise to the courts for future solution. Second, courts can * * * anticipate several of the most important of these questions and thus dispose *[sic]* with the need for having them later explored at the cost of future litigants. Far from deserving rebuke for dealing with hypotheticals, this practice reveals courts as being on occasion at least as well equipped as legislatures in laying down a reasonably comprehensive blueprint of reform." Fleming, *supra,* 281.

Finally, Professor Fleming analyzes

"the argument that legislative reform can give affected parties time to prepare themselves for the change of law, for example by procuring liability insurance and by adjusting cost calculations. Thus, statutes abrogating charitable and other immunities have commonly postponed their commencement for that purpose. But courts also have long broken with the Blackstonian fiction that judicial decisions must necessarily be retroactive in operation because they merely declare what the common law should always have been discovered to be." Fleming, *supra,* 281.

As is indicated by the above analysis, although the courts have not been the primary agencies for adoption of comparative negligence, they are certainly in as good, if not better, a position to evaluate the need for change, and to fashion that change.

Further, as to the final point raised by Professor Fleming regarding the need for advance warning, this is uniquely satisfied in this jurisdiction because the bench and bar were put on notice a year and a half ago when three members of this Court advocated adoption of comparative negligence in *Kirby, supra.*[11]

With all these factors in mind, we find adoption of comparative negligence is consistent with this Court's responsibility to the jurisprudence of this state.

*B. Appropriate Form of Comparative Negligence*

Extensive discussion in the WILLIAMS opinion in *Kirby* was devoted to an analysis of the most appropriate form of comparative negligence to adopt. *Kirby,* 629-645. Since that time, we have not altered our view that the doctrine of "pure" comparative negligence most nearly accomplishes the goal of a fair system of apportionment of damages. "Only pure comparative negligence truly distributes responsibility according to fault of the respective parties." Schwartz, Comparative Negligence (Indianapolis: Allen Smith Co, 1974), § 21.3, p 347.

As stated in *Kirby,*

"We are convinced, as was the United States Supreme Court and the other courts which have adopted the comparative negligence doctrine, that the 'pure' form is preferable to any other.

"The 'pure' form does not 'unjustly enrich' anyone. For example, if an accident is wholly the fault of one party, then that party would not, of course, recover damages. If an injured plaintiff was 51% to blame,

---

[11] Even earlier notice of impending change was presented in the WILLIAMS opinion in *Vanderah v Olah,* 387 Mich 643, 659-661; 199 NW2d 449 (1972). Further, the notice provided by *Kirby* has apparently been heeded by litigants in Michigan, see fn 13, *infra,* and accompanying text.

there still remains 49% of the fault which was not plaintiff's, and for which therefore the person who caused that much of the injury should be liable.

"The rule preventing recovery if plaintiff's negligence exceeds 50% of the total fault is just as arbitrary as that which completely denies recovery. Is the person who is 49% negligent that much more deserving than the one who is 51% negligent?

"We acknowledge that even under the 'pure' form of comparative negligence there will be appeals concerning the percentage of award, but it is undoubtedly more compelling to appeal when you have been awarded nothing than when you have received some compensation. However, just as we did not reach our decision on contributory negligence because of the anticipated number of case filings, we will not reach our decision on the form of comparative negligence because of an equally unpredictable element, the anticipated number of appeals.

"Commentators acknowledge that the hybrid 50% rule leads to strange results.

\* \* \*

"What the hybrid rule does in fact is not eliminate contributory negligence, but merely lower the barrier.

"The doctrine of pure comparative negligence does not allow one at fault to recover for one's own fault, because damages are reduced in proportion to the contribution of that person's negligence, whatever that proportion is. The wrongdoer does not recover to the extent of his fault, but only to the extent of the fault of others. To assume that in most cases the plaintiff is more negligent than the defendant is an argument not based on equity or justice or the facts. What pure comparative negligence does is hold a person fully responsible for his or her acts and to the full extent to which they cause injury. That is justice.

"This is the system of comparative negligence judicially adopted in Florida, California, Alaska, and by the United States Supreme Court to replace the equal division rule in admiralty actions. It is the system in the FELA, the Merchant Marine Act, the Jones Act, and Death on the High Seas Act. It is simplest to

administer where multiple defendants are concerned. The system in operation has not led 'to runaway verdicts for negligent plaintiffs'. Schwartz, Treatise, § 3.2, p 52.

"We recognize that the 50% system has been the most popular among those legislatively adopted. Schwartz, § 3.5, p 73. But it is not the system which we believe will really do justice." (Footnotes omitted.) *Kirby,* 642-645.

Recognizing this same rationale, we now adopt the pure form of comparative negligence.[12] Hereafter, a special verdict shall be used in any negligence case where the negligence of the plaintiff is at issue.[13]

## C. *Appropriate Application*

The extent of application of the new rule announced today remains to be determined. Although there are a great variety of ways in which a new rule of law may be given effect, application normally falls within one of three main categories. A new rule can be (1) made applicable to all cases in which a cause of action has accrued and which are still lawfully pending and all future cases, (2) made applicable to the case at bar and all future cases or (3) made to exclude the case at bar but be made applicable to all cases to be filed hereafter or after an arbitrary control date specified herein. See *Myers v Genesee County Auditor,* 375 Mich 1, 11; 133 NW2d 190 (1965).

In *Li v Yellow Cab Co of California, supra,* 829, the California Supreme Court gave limited retroactive effect to its adoption of comparative negligence. The court stated that its opinion would be

---

[12] Of course, as noted in footnote 54 in the WILLIAMS opinion in *Kirby,* 642, the Legislature in this state "has the power to reinstate contributory negligence or to modify this rule of comparative negligence".

[13] See the appendix for alternative suggested jury instructions and special verdict forms.

"applicable to all cases in which trial has not begun before the date this decision becomes final in this court, but * * * it shall not be applicable to any case in which trial began before that date (other than the instant case)—except that if any judgment be reversed on appeal for other reasons, this opinion shall be applicable to any retrial."

The Alaska Supreme Court in *Kaatz v State, supra,* 1050, applied its opinion adopting comparative negligence as follows:

"The rule will, of course, apply in the retrial of the case in which we have reversed the judgment today. It will also apply to any case in which the trial commences after the date of this opinion. In any case pending on direct appeal in which the application of the comparative negligence rule was requested or asserted in the trial court, and in which the request or assertion was preserved as a ground for appeal, there shall be a retrial under the principle of comparative negligence. Our holding today will be applicable to any trial which has commenced, but has not been submitted for decision by the trier of fact, and in which prior to submission to the trier of fact for decision there has been a request or an assertion that the rule of comparative negligence should be applied."

Finally, the Florida Supreme Court, in its opinion adopting comparative negligence, *Hoffman v Jones, supra,* 440, held that the

"* * * opinion shall be applied as follows:
"1. As to those cases in which the comparative negligence rule has been applied, this opinion shall be applicable. [In *Hoffman,* before the case reached the Florida Supreme Court, the District Court of Appeal had adopted comparative negligence.]
"2. As to those cases already commenced, but in

which trial has not yet begun, this opinion shall be applicable.

"3. As to those cases in which trial has already begun or in which verdict or judgment has already been rendered, this opinion shall not be applicable, unless the applicability of the comparative negligence rule was appropriately and properly raised during some stage of the litigation.

"4. As to those cases on appeal in which the applicability of the comparative negligence rule has been properly and appropriately made a question of appellate review, this opinion shall be applicable.

"5. This opinion shall be applicable to all cases commenced after the decision becomes final."

The long-standing rule of law has been in favor of full retroactivity. See *Kuhn v Fairmont Coal Co,* 215 US 349, 372; 30 S Ct 140; 54 L Ed 228 (1910); *Donohue v Russell,* 264 Mich 217, 219; 249 NW 830 (1933); 20 Am Jur 2d, Courts, § 233, p 562. However, more frequently courts are favoring more flexible approaches which allow determinations on a case-by-case basis.

"The determination of whether an overruling decision shall be applied retroactively or prospectively, is a matter left to state courts for determination on a case-by-case basis. As the Alaska Supreme Court noted:

" 'A state supreme court has unfettered discretion to apply a particular ruling either purely prospectively, purely retroactively, or partially retroactively, limited only "by the juristic philosophy of the judges * * *, their conceptions of law, its origin and nature." The decision is not a matter of law but a determination based on weighing the merits and demerits of each case. Consideration is given to applying a ruling prospectively "whenever injustice or hardship will thereby be averted." ' *Warwick v State ex rel Chance,* 548 P2d 384, 393-394 (Alas, 1976)." *Jones v Watson,* 98 Idaho 606, 608; 570 P2d 284 (1977).

See, also, *State ex rel Washington State Finance Committee v Martin,* 62 Wash 2d 645, 673; 384 P2d 833, 849 (1963). This Court has also recognized the principle,

"This Court has overruled prior precedent many times in the past. In each such instance the Court must take into account the total situation confronting it and seek a just and realistic solution of the problems occasioned by the change.

\* \* \*

"It is evident that there is no single rule of thumb which can be used to accomplish the maximum of justice in each varying set of circumstances. The involvement of vested property rights, the magnitude of the impact of decision on public bodies taken without warning or a showing of substantial reliance on the old rule may influence the result." *Williams v Detroit,* 364 Mich 231, 265-266; 111 NW2d 1 (1961) (opinion of Justice EDWARDS in which Justices TALBOT SMITH, T. M. KAVANAGH and SOURIS concurred).

The benefit of flexibility in opinion application is evident. If a court were absolutely bound by the traditional rule of retroactive application, it would be severely hampered in its ability to make needed changes in the law because of the chaos that could result in regard to prior enforcement under that law. When this Court overruled the doctrine of imputed negligence in *Bricker v Green,* 313 Mich 218, 236; 21 NW2d 105 (1946), that decision was applied to pending and future cases. Without the flexibility to so apply the decision, it would be unlikely that much needed change could be effectuated in this state.

We now turn to the question of the proper application in the instant case. In *Kirby, supra,* 645, the WILLIAMS opinion would have followed a course of applying comparative negligence, "\* \* \*

to the instant case and all cases filed after the date of this decision, where the negligence of plaintiff is an issue * * *". For two reasons we now find a slightly broader application to be proper.

First, affording limited retroactive effect to the better rule of comparative negligence will not unjustly burden litigants of this state. The limited retroactive application in *Bricker, supra* (to pending as well as future cases), could not work a hardship because there could be no detrimental reliance on the doctrine of imputed negligence.[14] By way of contrast, in *Parker v Port Huron Hospital,* 361 Mich 1; 105 NW2d 1 (1960), this Court overturned the doctrine of charitable immunity. We refused to give that decision any retroactive effect because of possible detrimental reliance placed upon that doctrine by charitable hospitals.

"In the interests of justice and fairness, in view of the new ruling and the reliance that some, albeit few, charitable, nonprofit hospital corporations may have placed on the old ruling, and may have failed to protect themselves by the purchase of available insurance, we believe the new rule should apply to the instant case and to all future causes of action arising after September 15, 1960, the date of the filing of this opinion." *Parker, supra,* 28.

Unlike *Parker,* no similar injustice could result by according some retroactive effect to the instant decision.

It is the second and we believe more unique factor, however, which encourages us to accord a limited retroactive application similar to that ac-

[14] This is not to say that some liability will not be created where none existed before. The fact that new liability may exist is unrelated to the problem of detrimental reliance on prior decisions of this Court.

corded by the three other state supreme courts faced with this specific issue.

Since July, 1977, the bench and bar of this state have had clear notice that three Justices of this Court were ready to adopt comparative negligence and that three others might be willing in another case. Since the issuance of *Kirby,* members of the bar of this state have diligently argued the issue on behalf of their clients. At this Court alone we presently have three cases being held pending this decision in which comparative negligence was raised and argued.[15] If no retroactive application is accorded our decision today, the fortuity that the instant plaintiffs' case was the first to arrive at this Court would be the sole determinant of who would benefit from the fairer doctrine of comparative negligence. This would be true despite the fact that many litigants had exercised the same diligence exercised by the instant plaintiffs in raising the issue.

Therefore, we hold the rule announced today applicable to the instant case and all appropriate cases in which trial commences after the date of this opinion including those in which a retrial is to occur because of remand on any other issue. Further, we find comparative negligence applicable to any case presently pending on appeal in which application of the doctrine was requested at the trial court and the issue preserved for appeal. Finally, comparative negligence shall be the applicable rule in any case commenced but not submitted to the trier of fact prior to the date of this decision, but in no case shall it apply unless there

[15] By order of March 29, 1978, *Castonia v J D Smith, Lake Region Development Co (Docket No. 60401)* is being held; by order of April 5, 1978, the *Estate of Dixon v The Young Men's Christian Ass'n (Docket No. 60728)* is being held; by order of May 24, 1978, *Turri v Bozek (Docket No. 60632)* is being held.

is an appropriate request by counsel prior to submission to the trier of fact.

## IV. Instruction on Plaintiff's Duty of Care

The trial court gave the following instruction to the jury regarding plaintiff's duty of care:

"Now, I want to instruct you jurors that the Supreme Court has said that a so-called right of way is not an assurance of safety, and does not grant an absolute right of way under all conditions. The driver on the street who does have a so-called right of way is still required to exercise due care in driving his car, or her car, in view of the conditions as they existed at that time. The driver on a favored highway, the superior highway, has a right to assume that other drivers will obey properly erected traffic signs, *but you must keep in mind here that this accident is with an authorized emergency vehicle which had a right under certain conditions to violate an erected traffic sign. The driver on a through highway may not proceed blindly. The driver is required to remain alert to hazards on the highway and to make reasonable observations of other drivers approaching the intersection and must keep such lookout ahead and to the sides of intersecting highways as a reasonably, prudent, careful person would do in order to discover possible dangers, and he must act carefully with the same care that the ordinary careful and prudent person would act upon the existing conditions that then existed."* (Emphasis added.)

At trial plaintiff's counsel objected to the instruction on the ground that plaintiff

"had no duty to look to either direction, but had a right to assume other vehicles were going to assume *[sic]* her the right of way until she knew or should have known that another vehicle was going to interfere with her right of way."

There are several statutes relevant to the resolution of this issue. One is MCL 257.649(f); MSA 9.2349(f), which gives the driver on a through street the right of way paramount to a driver traveling on a stop street,

"Except when directed to proceed by a police officer, *the driver of a vehicle approaching a stop intersection indicated by a stop sign shall stop before entering* the crosswalk on the near side *of the intersection * * *.*"* (Emphasis added.)

Cases interpreting this statute have held that the standard of care to which the favored driver (driver with the right of way) must adhere is a standard of reasonable or due care under the circumstances. See *Koehler v Thom,* 285 Mich 593, 598; 281 NW 336 (1938); *Beauchamp v Olsen,* 42 Mich App 323, 325; 201 NW2d 677 (1972). What is reasonable on the part of the favored driver has been further refined.

"*[T]he operator of an automobile proceeding through an intersection controlled by a traffic signal is under no duty to make an independent determination as to whether the traffic approaching a red light will stop.* In such a situation the operator of an automobile is not required to observe traffic approaching a red light to determine whether it is safe to proceed. The driver can justifiably rely on what all have come to expect—that traffic approaching a red light will stop." *Buchholtz v Deitel,* 59 Mich App 349, 352; 229 NW2d 448 (1975).[16] (Emphasis added.)

---

[16] Defendant attempts to distinguish "traffic light" cases from "stop sign" cases. Our research, however, has led us to no authority holding that there is a valid basis for distinction between these two means of traffic control. If anything, it would appear that a right of way existing under authority of a green light is less reliable from a driver's viewpoint because the street with the right of way is continuously changing. In contrast, placement of a stop sign on only one of two intersecting streets is tantamount to a declaration that one street is always dominant.

This reliance, of course, does not absolve the favored driver from the need to exercise due care. See *Beauchamp v Olsen,* 42 Mich App 323; 201 NW2d 677 (1972).

Other statutes must also be considered when, as in the instant case, there is an authorized emergency vehicle involved. MCL 257.653; MSA 9.2353 states in relevant part,

"(a) Upon the immediate approach of an authorized emergency vehicle * * *

* * *

"1. The driver of every other vehicle shall yield the right of way * * *

* * *

"(b) *This section shall not operate to relieve the driver of an authorized emergency vehicle from the duty to drive with due regard for the safety of all persons using the highway."* (Emphasis added.)

Further, MCL 257.603; MSA 9.2303, states in relevant part,

"(c) The driver of an authorized emergency vehicle may:

* * *

"2. *Proceed past a red or stop signal or stop sign, but only after slowing down as may be necessary for safe operation.*

"3. Exceed the prima facie speed limits so long as he does not endanger life or property." (Emphasis added.)

Under these statutes it is clear that defendant, like plaintiff, is not absolved of the duty to drive "* * * with due regard for the safety of others * * *". *Kalamazoo v Priest,* 331 Mich 43, 48; 49 NW2d 52 (1951). Neither plaintiff nor defendant, therefore, had an absolute right to proceed blindly.

We must now determine if the instruction as framed by the trial court correctly set forth the law as to plaintiff's duty of care.

In 1937 this Court was faced with a case similar to the one at bar, *Lansing v Hathaway,* 280 Mich 87; 273 NW 403 (1937). In that case a fire truck owned by the city of Lansing proceeded through a red stop light while on an emergency run. The fire truck was struck by defendant's vehicle which was proceeding under benefit of a green light. The city brought suit to recover its damages in repair of the truck and cure of the injured firefighters. The visibility was reduced in that case by a severe rain storm.

The plaintiff city appealed a bench trial judgment in favor of defendant.

This Court, relying on a city ordinance which was consistent with the present statutes on emergency vehicles, set forth the applicable standard.

"We assume, for the purposes of decision, that, under the city ordinance, the fire truck, as an emergency vehicle responding to a fire alarm, had a right to run the red light upon giving 'audible signal' and having reasonable regard for the safety of others. *Defendant had a right, under permission of the green light, to cross the intersection unless, by the reasonable exercise of the senses of sight and hearing, he should have noticed or heard warning to the contrary."* (Emphasis added.) *Hathaway, supra,* 89.

This same standard was upheld by this Court in *Holser v Midland,* 330 Mich 581, 584; 48 NW2d 208 (1951), and by the Court of Appeals in *Keevis v Tookey,* 42 Mich App 283, 287; 201 NW2d 661 (1972).

We again affirm the correctness of the *Hathaway* standard to the effect that the driver travel-

ing on a through street, as against an emergency vehicle, has a right to cross the intersection unless, by the reasonable exercise of the senses of sight and hearing, he or she should have noticed or heard warning to the contrary.

As quoted above, in instructing as to plaintiff's duties, the court stated:

"The driver on a through highway may not proceed blindly. *The driver* [Placek] *is required to remain alert to hazards on the highway and to make reasonable observations of other drivers approaching the intersection and must keep such lookout ahead and to the sides of intersecting highways as a reasonably, prudent, careful person would do in order to discover possible dangers, and he must act carefully* with the same care that the ordinary careful and prudent person would act upon the existing conditions that then existed."

We find the instructions on the whole to be unfairly and erroneously weighted against plaintiff.

Under the law of this state, plaintiff could proceed unless, by the reasonable exercise of sight and hearing, she *should* have noticed or heard warning to the contrary. *Hathaway, supra,* 89. Reasonable exercise includes a duty to be "fairly alert as to potential dangers that may be readily seen or heard". *Holser, supra,* 584. There is a discernible difference between remaining *fairly* alert to *readily cognizable* potential dangers which she should have noticed or heard under *Holser* and *Hathaway,* and being "required to remain alert to hazards". While the specific language "required to remain alert to hazards" appears in *Krause v Ryan,* 344 Mich 428; 74 NW2d 20 (1955), the language in *Krause* is simultaneously tempered by other language similar to that required by *Hathaway.*[17] In the instant case there was no

___

[17] In *Krause* the quoted language appears within the context of the following paragraph:

such tempering to place plaintiff's duty in the proper perspective.

Similarly, authority for the trial court's instruction that the favored driver,

"* * * *must keep such lookout ahead and to the sides of intersecting highways as a reasonably prudent careful person would do in order to discover possible dangers, and he must act carefully* with the same care that the ordinary careful and prudent person would act upon the existing conditions, that then existed" (emphasis added),

appears in the case of *Arnold v Krug*, 279 Mich 702, 708; 273 NW 322 (1937). Again, however, the language only appears within the context of other qualifying language.[18]

"The driver on the arterial, we have decided, is the favored driver. It is not necessary in approaching an intersection, as we said in *Arnold v Krug* [279 Mich 702, 707; 273 NW 322 (1937)], that he 'have his car under such control * * * that he may stop at once and avoid collision with persons who may illegally come into his path.' *Lacking notice otherwise, he may assume that others using the highways will comply with the rules of the road and properly posted signs and he is not guilty of contributory negligence in acting upon such assumption. It should not, however, be assumed from the foregoing that he may proceed blindly upon the arterial, secure in the supposition that he can do no wrong. He must remain alert to the hazards surrounding him and with which he is confronting others."* (Emphasis added.) *Krause, supra,* p 432.

[18] In *Arnold,* this Court stated prior to the language quoted in the instruction,

*"The right of way accorded to a driver upon a trunkline highway is something more than the privilege of going through the intersection in advance of a car which reaches it at the same time.* Drivers approaching the trunkline are required to stop before entering the intersection whether anyone is at or near the crossing or in sight on the trunk highway. It is an improved road—usually hard surfaced. Its purpose is to afford rapid transit. *The driver is entitled to assume that those approaching it will obey the law and stop. He is not obliged to have his car under such control at each intersecting road that he may stop at once and avoid collision with persons who may illegally come into his path."* (Emphasis added.) *Arnold, supra,* p 707.

Subsequent to the instructed language,

"A driver cannot be convicted of negligence on a general charge that he did not exercise the care a prudent person would have used

Adding to the unfair impact of the instruction regarding plaintiff's duties is the fact that the trial court stated in relation to plaintiff and in the course of the objected-to instruction, that the "driver on a through highway may not proceed blindly". Although the same is true as the law of this jurisdiction applies to the driver of an emergency vehicle, no similar instruction was given as to defendant.

We find the instructions as given constitute error because they unfairly represent the law as to plaintiff's duties.[19] The fact that they do not suffi-

---

under the circumstances. It is necessary to charge and prove the specific act he did or did not do. Wallace [the driver of defendant's truck] was driving on the right side of the road at a very reasonable rate of speed and with his truck under control. The only claim of fault which could be made against him, and which the court found, is that he failed to reduce his speed as he neared the intersection. But to what rate should he have reduced the speed? It is evident that, to have avoided the collision, he would have had to so slacken his speed that he could have stopped well within 30 feet. To impose such a duty on drivers upon trunkline highways would seriously impair their purpose, be foreign to the general conception of careful drivers of their rights and duties upon them, in large measure destroy the preferential right of way, and offer inducement to drivers approaching on intersection roads to violate their legal duties. It is not the rule as a matter of law.

"Nor as a matter of fact was such duty to slacken speed imposed on Wallace. He was obliged to anticipate such possible danger in the intersection and do such acts to avoid it as a reasonably prudent person would have anticipated and done, if such person had the knowledge of the situation which Wallace possessed and had the right to assume that one about to enter the trunk highway at the intersection would perform his legal duty to stop and look for traffic." *Arnold, supra,* p 708.

Read within the context of its surrounding language, the words employed in the instruction are greatly qualified.

[19] In dissent to our finding of error, Chief Justice Coleman finds that plaintiff's position was fairly communicated. As support for her conclusion she quotes the following statement of the trial judge made during his charge to the jury:

"It is the plaintiff's claim further that the defendant here, Mr. Ernst, must establish by convincing evidence *that the plaintiff knew, or should have known, of the approach of the police car under the circumstances that she was confronted with.*

"It is the plaintiff's theory that at all times * * * [she] acted as a

ciently define defendant's duties is not a specific basis for this appeal and is merely noted to preclude similar error and further prolongation of this litigation.

## V. DEFENDANT'S NEGLIGENCE

Prior to the trial court's submission of the instant case to the jury, counsel for plaintiffs moved for a directed verdict on the issue of defendant's negligence. The motion was denied by the trial court.

---

reasonable, prudent person would have acted under the same or similar circumstances * * *." (Emphasis added.)

We cannot agree because we do not equate a trial judge's statement of plaintiff's theory of the case (which is exactly what the above quoted language is) with an instruction as to the law. The trial judge in the case at bar agreed that there is a vast distinction between these two. After instructing as to the theories and the general duties of the jurors, the judge stated, "[n]ow, what we are just beginning to enter now, *the important part of the instructions * * *"* (emphasis added). The judge then proceeded to instruct as to the legal definitions and duties. It is the latter "important" portion in the instructions which we find to constitute error.

Further as added support for finding plaintiff's position fairly communicated, the dissent states,

"Finally, the trial judge did instruct that the plaintiff was driving on a 'superior highway' and that

" '[t]he driver on a favored highway, the superior highway *has a right to assume that other drivers will obey properly erected traffic signs* * * *.' (Emphasis added.)

"These instructions fairly informed the jury of the plaintiff's rights as a favored driver."

This quotation, however, omits the second half of the instructed sentence. The full sentence reads as follows:

"The driver on a favored highway, the superior highway, has a right to assume that other drivers will obey properly erected traffic signs, *but you must keep in mind here that this accident is with an authorized emergency vehicle which had a right under certain conditions to violate an erected traffic sign."* (Emphasis added.)

We do not question that the trial judge must instruct as to defendant's rights, but this had already been fully accomplished and repetition within the above context stripped the language as to plaintiff's rights of its proper impact.

Under these circumstances, we are convinced that the instructions in the instant case were so unfairly weighted against plaintiff as to constitute reversible error.

Plaintiffs claim at this Court that the denial of this motion constituted error because the evidence presented below clearly established that the defendant failed to exercise due care prior to entering the intersection. Plaintiffs contend that this negligence is evidenced by defendant's excessive speed and by defendant's act of merely glancing to his right and then observing only the Woods' vehicle. This issue need not long detain us.

It is clear from the testimony that the speed at which defendant Ernst was traveling is in dispute. Virginia Woods testified that defendant was exceeding the 35-mile-per-hour speed limit, Cabell Woods testified that defendant was traveling at 40 miles per hour, and Officer Ernst told Officer James Porter, the investigating officer at the scene of the accident, that he was traveling at 30 miles per hour. (See Part I, *supra.)*

Further support for a finding of the existence of a dispute as to both speed and whether defendant did reasonably attempt to observe the surrounding traffic is found in the deposition of defendant Ernst which was read into the record at trial. During that deposition, the following exchange occurred:

"*Q.* * * * Now, when you entered the intersection did you make an observation of the intersection before you entered it to see if there was any other traffic approaching either from the east or west on Plumbrook?

"*A.* I observed the intersection as a whole, yes, sir.

"*Q.* And all you saw was this one car?

"*A.* Yes, sir.

"*Q.* Now, as you entered the intersection did you make an observation to the right or to the left to see if there was any traffic approaching?

"*A.* I was primarily interested in that car [Woods' vehicle]. No traffic to the left, or southwest of Schoen-

herr on Plumbrook, and I was primarily interested to make sure that this car that was at the stop sign remained stopped, wouldn't pull out in front of me any further.

"*Q.* Did you make an observation as you entered the intersection to the right to see if there was any other traffic approaching from the west traveling east on Schoenherr?

"*A.* Yes, sir.

\* \* \*

"*Q.* Let me ask you this: When you stated you were slowing down to enter the intersection of Plumbrook, knowing that Plumbrook was a through street, how much did you slow your car down to?

"*A.* Like I say, a rolling speed.

"*Q.* What would that be, rolling speed?

"*A.* 5 miles, 6, 8 miles an hour, something like that.

"*Q.* As you approached this intersection of Plumbrook you decelerated your car, braked your automobile until you got down to a speed where you could stop if there was any traffic coming from the east or west on Plumbrook?

"*A.* Yes, sir.

\* \* \*

"*Q.* Approximately?

"*A.* Hard to say, 8, 10 miles an hour, somewhere in there, just a rough estimate.

\* \* \*

"*Q.* But it wasn't 30 miles an hour?

"*A.* To my knowledge, no, sir."

Although it is undisputed that defendant did not observe plaintiffs' vehicle, there remains a question of fact as to whether the failure to observe plaintiffs' car constituted negligence because of the existence of another potential danger—the Woods' vehicle.

Plaintiffs claim however, under authority of *Kalamazoo v Priest,* 331 Mich 43; 49 NW2d 52 (1951),

that defendant's negligence is established. In *Priest,* the city sued a driver who had collided with a fire truck under circumstances similar to the instant case except for the fact that the firefighter driving the truck had seen defendant's car and had sped up in an effort to pass ahead and avoid the accident. Based on the defense of contributory negligence, the trial court directed a verdict in favor of defendant. This Court affirmed because

"plaintiff's driver did not make proper observation nor see seasonably what was plainly there to be seen so as to be able to form a reasonable belief as to whether he could proceed into the intersection in safety." *Priest, supra,* 47.

The emergency vehicle statute operative in *Priest* required the exercise of due regard for the safety of others; plaintiff's driver, as a matter of law, was held to have violated that statute.

"Inasmuch as the statute has not relieved drivers of fire trucks from the same duties to maintain a lookout, to see and heed what is present to be seen, and, on the basis of such observation, to form a reasonable belief that it is safe to proceed, it follows inescapably that plaintiff's driver must likewise be held to have been guilty of contributory negligence as a matter of law, barring plaintiff's right to recovery." *Priest, supra,* 48.

We find *Priest* distinguishable on two grounds. First, in the instant case there remains a question of fact as to the speed at which defendant was traveling. The issue of defendant's speed is part of plaintiffs' proofs as to defendant's negligence. Second, as stated above, there remains a question of fact as to whether the failure to observe plaintiffs' vehicle was negligent because defendant was focus-

ing his attention on the Woods' vehicle which could rightfully be considered a potential danger.

We, therefore, agree with the trial court as to this issue. We cannot say, as a matter of law, that defendant breached his duty to proceed with due regard for the safety of others. The issue must be determined by the trier of fact.

## VI. CONCLUSION

The doctrine of contributory negligence in Michigan is hereby replaced with the more just and equitable doctrine of comparative negligence to be applied in the limited retroactive manner discussed in Part III C, *supra.*

We find error in the trial court's jury instruction as to plaintiff's duty of care but affirm the decision of the trial court that defendant's negligence is a question of fact to be decided by the trier of fact.

Reversed and remanded for new trial. Costs to plaintiffs.

LEVIN and BLAIR MOODY, JR., JJ., concurred with WILLIAMS, J.

KAVANAGH, J. I concur in the opinion but not in the matter contained in the appendix.

## APPENDIX

Until such time as this Court promulgates Standard Jury Instructions, the following suggested alternative instructions, or any other appropriate instructions, may be used in any negligence case where the negligence of the plaintiff is at issue. The suggested alternative instructions are intended for use in those situations where one plaintiff, one defendant and one claim are involved.

Appropriate modifications would be necessary in more complicated fact situations *(e.g.,* multiple tortfeasors, counterclaims or cross-claims).

Hereafter, a special verdict shall be used in any case where the negligence of the plaintiff is at issue. Suggested alternative special verdict forms for use in cases involving one plaintiff, one defendant and one claim are set forth below. Again, modifications would be necessary in more complicated situations.

Additional guidelines for jury instructions and special verdict forms may be found in the case law, statutes, court rules and instructions of those states which have already adopted pure comparative negligence (Alaska, California, Florida, Mississippi, New York, Rhode Island and Washington).

## *Alternative Suggested Jury Instructions*

(The following instructions should be preceded by the usual legal definitions of such terms as negligence and proximate cause.)

1. If you find that the defendant was not negligent or that the defendant's negligence was not a proximate cause of the plaintiff's injury, you will find for the defendant.

2. If you find that defendant was negligent and that defendant's negligence was a proximate cause of plaintiff's injury, then you shall determine the total amount of plaintiff's damages.

3. You must then determine whether plaintiff was also negligent and whether plaintiff's negligence was a proximate cause of his/her injury. If you find that plaintiff was not negligent or if plaintiff's negligence was not a proximate cause of his/her injury, then you will render a verdict for plaintiff in the full amount of his/her damages.

4. If you find that each party was negligent and that the negligence of each party was a proximate cause of the plaintiff's injuries or damages, then you must determine the degree of such negligence, expressed as a percentage, attributable to the plaintiff. Negligence on the part of the plaintiff does not bar recovery by the plaintiff against the defendant. However, the percentage of negligence attributable to the plaintiff will be used by the court to reduce the amount of damages which you find to have been sustained by the plaintiff.

[*Alternative instruction No. 4 for use with Alternative Suggested Special Verdict Form No. II:*

4. If you find that each party was negligent and that the negligence of each party was a proximate cause of the plaintiff's injuries or damages, then you must determine the degree of such negligence, expressed as a percentage, attributable to the defendant. Negligence on the part of the plaintiff does not bar recovery by the plaintiff against the defendant. However, only the percentage of negligence attributable to the defendant will be used by the court to compute the amount of damages which will be awarded to the plaintiff.]

5. The court will furnish you a Special Verdict Form to assist you in your duties. Your answers to the questions in the Special Verdict Form will provide the basis by which this case will be resolved.

*Alternative Suggested Special Verdict Form No. I*

"We, the jury, make the following answers to the questions submitted by the court:

"QUESTION No. 1: Was the defendant negligent?

"Answer: _____ (Yes or No)

"(If your answer is 'No,' do not answer any further question.)

"QUESTION No. 2: Was the defendant's negligence a proximate cause of injury or damage to the plaintiff?

"Answer: _____ (Yes or No)

"(If your answer is 'No,' do not answer any further question.)

"QUESTION No. 3: What is the total amount of the plaintiff's damages?

"Answer: $_____.

"QUESTION No. 4: Was the plaintiff negligent?

"Answer: _____ (Yes or No)

"(If your answer is 'No,' do not answer any further question.)

"QUESTION No. 5: Was the plaintiff's negligence a proximate cause of the injury or damage to the plaintiff?

"Answer: _____ (Yes or No)

"(If your answer is 'No,' do not answer any further question.)

"QUESTION No. 6: Using 100% as the total combined negligence of the parties which * * * [proximately caused] the injury or damage to the plaintiff, what percentage of such negligence is attributable to the plaintiff?

"Answer: _____%.

"_____ Foreman." Wash PJI 45.10.01.

*Alternative Suggested Special Verdict Form No. II*

"We, the jury, make the following answers to the questions submitted by the court.

"QUESTION No. 1: If you find that the defendant was negligent and that his/her negligence was a proximate cause of injury or damage to the plaintiff, what is the total amount of plaintiff's damages?

"Answer: $_____.

"QUESTION No. 2: If you find that the plaintiff was also negligent and that his/her negligence was a proximate cause of his/her injury or damage,

what percentage of the total combined negligence of the plaintiff and defendant is attributable to the defendant?

"Answer: _____%.

"_____. Foreman."

COLEMAN, C.J. *(concurring in part; dissenting in part)*. Leave was granted in this case limited to the following issues:

1. Whether the Court's instruction as to plaintiffs' duty of care was prejudicially erroneous;

2. Whether reasonable minds can differ as to Officer Ernst's negligence; and

3. Whether a comparative negligence standard should be adopted in Michigan.

We concur with Justice WILLIAMS' determination that this Court should adopt a system of pure comparative negligence. Although cognizant of the view that such judicial action may be seen by some as usurping the legislative prerogative, we find the countervailing arguments to be persuasive, given the limited scope of legislative action in other jurisdictions[1] and the judicial genesis of the contributory negligence concept which now is supplanted by the comparative negligence concept.

[1] There is little doubt that this Court has the power to change a common-law rule. The most compelling argument supporting legislative adoption of comparative negligence, rather than judicial adoption, is that the Legislature has unique abilities to consider the proper form and make the necessary adjustments in the law to provide for a smooth implementation of comparative negligence. Unfortunately, the experience in every other jurisdiction which has legislatively adopted comparative negligence has been that only a basic statute was passed. The ramifications of the change were not addressed. *E.g.,* Symposium, *Comments on* Maki v Frelk—*Comparative v Contributory Negligence: Should the Court or Legislature Decide,* 21 Vand L Rev 889 (1968), *Kaatz v State,* 540 P 2d 1037 (Alaska, 1975), *Li v Yellow Cab Co of California,* 13 Cal 3d 804; 532 P 2d 1226; 119 Cal Rptr 858 (1975), *Hoffman v Jones,* 280 So 2d 431 (Fla, 1973).

We also agree that the issue concerning Officer Ernst's negligence is a question of fact to be decided by the jury.

Our disagreement with Justice WILLIAMS' opinion is twofold. First, the retroactive application of today's decision is both unwieldy and inequitable. It may reasonably be expected to have an adverse effect upon the orderly administration of justice and to fall unfairly upon litigants and others. Justice WILLIAMS' opinion provides that the decision be effective as to all cases in which the "issue" was preserved and to all negligence cases which have not yet gone to the jury. The broad retroactive application is explained partially by the fact that the bench and bar knew as of July, 1977, that three justices "were ready to adopt comparative negligence". Our Court divided 3 to 3 in *Kirby*,[2] the effect of which was to retain the contributory negligence rule in accordance with the Court of Appeals opinion in the case. Bench and bar remained bound by the law. Therefore, the trial judge committed no "error" to be preserved. Conversely, it would have been error so to instruct. A theory of retroactivity dependent upon the clairvoyance or the gambling instincts of counsel is, in our opinion, not sound. Also, applicability to cases tried to the point of submission to the jury leaves litigants in the possible position of having presented proofs and arguments of law based on one tort theory but having the "ground rules" subsequently changed so the jury must decide their fate on entirely new rules.

Although we would have preferred to adopt the concept by court rule and supporting jury instructions, all of which would, of course, have been prospective in application, such is not to be. There-

---

[2] *Kirby v Larson,* 400 Mich 585; 256 NW2d 400 (1977).

fore, our assessment of the matter as it stands, leads us to the conclusion that it would be fair to the most litigants and less disruptive to the administration of justice if the Court would provide that this fundamental change in Michigan's system of tort law be applied only in a purely prospective fashion, effective as to causes of action arising after the date of this opinion.

Such a decision would provide time for well considered and appropriate court rules and jury instructions to be drafted. It would provide adequate notice to attorneys in preparation of their cases. Importantly, our already overburdened courts would not have to face now unknown quantities of retrials of error-free cases or extensive motions for amended pleadings and other devices to rescue in the course of trial cases which were commenced on a tort theory suddenly not in existence. Such an application also would avoid the possible invalidation of the bases of various contracts. It would give the Legislature fair notice.

Secondly, we find no reversible error in the trial court's instruction to the jury concerning the plaintiffs' duty of care. The charge fairly informed the jury of plaintiffs' rights and duties.

Therefore, we would not reverse the jury's verdict on either basis but would affirm with no costs to either party, a public question being at the heart of grant of leave to appeal. In our view, pure comparative negligence should be applicable to causes of action which accrue after the effective date of this opinion.

I

Historically, traditional notions of the role of appellate courts were that they merely discover

and then declare the meaning of the common law. The reality that this body of law, as opposed to statutory law, was judge-made was ignored. From this Blackstonian premise that judges did not make law came the conclusion that all overruling decisions were necessarily retroactive—that is, the overruled decision was viewed as if it had never existed because the true rule, which had always been the law, was now discovered.[3]

Modern jurisprudence has abandoned this ostrich-like approach, recognized the obvious and acknowledged that whenever a court overrules prior precedent it is functioning in a lawmaking capacity. This acceptance has raised the concomitant question: what are the proper limits upon judges when they make law? One element of the problem is the extent to which the overruling decision should be applied. Because in some instances "considerations of convenience, of utility, and of the deepest sentiments of justice"[4] militate against the retroactive application of a new rule, the doctrine of prospective overruling has been forwarded as a judicial tool to promote both stability and development in the law.

Prospective overruling "is a procedural device which expressly recognizes the legislative nature of the act of overruling prior decisions, and recognizing it proceeds to establish a·time from which the *new law* applies".[5] It is relevant that new

---

[3] A historical development of retroactivity and prospectivity is set forth in *Linkletter v Walker*, 381 US 618; 85 S Ct 1731; 14 L Ed 2d 601 (1965). See, also, Levy, *Realist Jurisprudence and Prospective Overruling*, 109 U Pa L Rev 1 (1960), Note, *Prospective Overruling and Retroactive Application in the Federal Courts*, 71 Yale L J 907 (1962).

[4] Cardozo, The Nature of the Judicial Process, 149 (1921). For a discussion of the Cardozo philosophy see Schaefer, *The Control of "Sunbursts": Techniques of Prospective Overruling*, 42 NYU L Rev 631 (1967).

[5] Rogers, *Perspectives on Prospective Overruling*, 36 U of Missouri

statutory law is prospective from the effective date unless otherwise provided.

We believe that because the shift from a system of contributory negligence to a system of comparative negligence is such a fundamental change in Michigan's law of torts that considerations of justice, judicial administration and sound jurisprudence mandate a prospective application of our holding.

Prospective overruling came to prominence as a judicial method in *Great Northern R Co v Sunburst Oil & Refining Co,* 287 US 358; 53 S Ct 145; 77 L Ed 360 (1932). Mr. Justice Cardozo, writing for a unanimous Court, held that the technique of prospective application utilized by the Montana Supreme Court was not proscribed by the Federal Constitution. Indeed, he stated that the choice between retroactive or prospective application of a new decision depends upon the "juristic philosophy" of the particular court, regardless of whether "the subject of the new decision is common law * * * or statute." *Id.* at 365.[6]

---

at Kansas City L Rev 35-36 (1968). Terminology can be misleading in this area:

"For the reader unfamiliar with the jurisprudence of retroactivity, an introductory perspective may be useful. The issue that the Court has sought to deal with is whether a case that substantially alters the relevant body of prior law should govern (1) only future cases and neither the parties before the court nor any previous or pending cases ('pure prospectivity'), (2) future cases as well as the litigants at bar but not previous or pending cases ('nonretroactivity'), or (3) future cases, the present litigants, and all fact situations arising before the date of the law-changing decision that are still reviewable either by direct appeal or by collateral attack ('retroactivity')." Beytagh, *Ten Years of Non-Retroactivity: A Critique and a Proposal,* 61 Va L Rev 1557, fn 2 (1975).

[6] Mr. Justice Cardozo said, in full:

"We think the federal constitution has no voice upon the subject. A state in defining the limits of adherence to precedent may make a choice for itself between the principle of forward operation and that of relation backward. It may say that decisions of its highest court, though later overruled, are law none the less for intermediate trans-

"Sunbursting" became an accepted technique during the judicial activism of the 1960's[7] and its use has been embraced and advocated by legal commentators for many years.[8] In civil cases, we believe that prospective application is primarily warranted in instances, such as this case, where the overruling decision replaces a rule which has been in existence and generally utilized for many years.[9]

Prospective application of a decision which affects every negligence action in our state is particularly appropriate because of its broad, legislative-like impact. As Justice WILLIAMS wrote in *Siirila v Barrios*, 398 Mich 576, 634; 248 NW2d 171 (1976):

"The rule decreeing that the standard of care of general practitioners is determined by reference to the

---

actions. Indeed there are cases intimating, too broadly, that it *must* give them that effect; but never has doubt been expressed that it *may* so treat them if it pleases, whenever injustice or hardship will thereby be averted. On the other hand, it may hold to the ancient dogma that the law declared by its courts had a Platonic or ideal existence before the act of declaration, in which event the discredited declaration will be viewed as if it had never been, and the reconsidered declaration as law from the beginning. The alternative is the same whether the subject of the new decision is common law or statute. The choice for any state may be determined by the juristic philosophy of the judges of her courts, their conceptions of law, its origin and nature. We review not the wisdom of their philosophies, but the legality of their acts." *Great Northern R Co v Sunburst Oil & Refining Co*, 287 US 358, 364-365; 53 S Ct 145; 77 L Ed 360 (1932). (Citations omitted.)

[7] *E.g., Linkletter v Walker*, 381 US 618; 85 S Ct 1731; 14 L Ed 2d 601 (1965), *Stovall v Denno*, 388 US 293; 87 S Ct 1967; 18 L Ed 2d 1199 (1967), *Desist v United States*, 394 US 244; 89 S Ct 1030; 22 L Ed 2d 248 (1969).

[8] *E.g.,* Levy, *Realist Jurisprudence and Prospective Overruling,* 109 U Pa L Rev 1 (1960), Currier, *Time and Change in Judge-Made Law: Prospective Overruling,* 51 Va L Rev 201 (1965), Beytagh, *Ten Years of Non-Retroactivity: A Critique and a Proposal,* 61 Va L Rev 1557 (1975).

[9] Clearly, there are basic differences in the relevant considerations and their respective importance depending upon whether the case is civil or criminal.

standard in the same or similar communities *has long been accepted by bench and bar. Therefore, rather than apply the new rule of law to the case at bar, we would apply it to all cases tried after the date this opinion issues.* 'A state in defining the limits of adherence to precedent may make a choice for itself between the principle of forward operation and that of relation backward.' *Great Northern R Co v Sunburst Oil & Refining Co,* 287 US 358, 364; 53 S Ct 145; 77 L Ed 360 (1932)." (Emphasis added.)

The determinative factor in *Siirila* was the longstanding usage and reliance of the bench and bar upon the old rule. It is clear in this case also that from the standpoint of justice, the crucial determinant of the extent of application of an overruling decision is the reliance placed upon the old rule by the people of our state.

## II

### A

In this case, Justice WILLIAMS, in a commendable desire to apply broadly the principle of comparative negligence, apparently has overlooked the fact that application of the overruling decision to the parties before us, cases which have not yet gone to the jury, and cases in the appellate pipeline ("issue" saved for appeal) leaves out a class of litigants who correctly relied upon the then-effective state of the law. There undoubtedly were many lawsuits which were not brought, or were settled or tried to a conclusion in the post-*Kirby* era alone which would not receive benefits possible from today's holding because of reliance upon our own mandates. It is unjust to deny benefits of the majority decision to such plaintiffs and defendants

(perhaps even as counter-claimants) while granting them to other litigants.

We do not view the unreliable "foreshadowing" doctrine as a viable basis for bestowing any possible benefits of *Placek* upon those litigants who undertook the useless exercise of appending a trial request for a comparative negligence instruction to the exclusion of those who did not. The trial court was bound by our rule of contributory negligence. It would have been error to instruct on comparative negligence. Those who anticipated the *Placek* decision are no more deserving of its application than those who did not.

Perhaps most importantly, the decision undermines the application of stare decisis. If the bench and bar cannot rely upon our requirements, upon what can they rely? In this case, there can be change without injustice while preserving a stable and reliable judicial course.

We do not advocate full retroactivity for the reason that society's interest in fairness and the stability and certainty of the law outweighs our desire to apply backwards into history what may prove to be a more sound legal principle, although not based on a constitutional precept.

Further, the reopening of the negligence cases affected would place a stunning burden upon our already clogged court system.

## B

The majority opinion justifies its retroactive application by placing substantial weight upon the inequity of choosing one case *(i.e., Placek)* as a vehicle for making a needed change in the law to the exclusion of all others in which the proposal was raised after *Kirby.* This problem was created

because the benefits of the decision were considered, seemingly automatically, to be due the parties in the instant case.

The central question then becomes whether the instant parties should be accorded any perceived benefits of our holding. Purely prospective application, as opposed to prevailing-party prospective or nonretroactive application, has been criticized on two grounds.[10] It has been argued that litigants who believe that they will not receive the fruits of an overruling decision will have little incentive to seek needed development in the law. Necessary change will be thwarted or delayed.

We give little credence to those who portend that meaningful growth in the law will be stifled.

Individual litigants will always maintain the hope that (1) the Court will change the law and (2) that the change will apply to them. It is well understood that neither is a certainty.

The effective date of opinions is usually selected after weighing considerations of fairness, intent, the extent of reliance upon former law and the impact upon the legal and judicial systems. In some cases, constitutional considerations must be placed on the scales. The fact that an occasional case may be given prospective application in the interests of justice is not seen as a deterrant to creative appeal.

In the majority of such cases decided by this Court, the appellant has received the benefit of the new law, and we anticipate no change. However, there will always be exceptional cases where dramatic changes are made in the legal scheme, raising considerations of fairness which extend far

---

[10] A good discussion of the objections may be found in Currier, footnote 8 *supra,* at 214-234 and Beytagh, footnote 8 *supra,* at 1613-1615.

beyond the instant appellant(s). Such extensive reliance has been placed upon existing law that legislation, common law and rules of practice have been built upon the concept. Removal of the foundation will cause the collapse of those other rules of law. It is unlikely that an occasional change of law which does not benefit the instant plaintiff or defendant will result in any less litigation.

Also, in the real world, individual litigants will always exist who will bear the cost of litigation secure in the knowledge that their success or failure will have ramifications upon their own interests far beyond the scope of the instant litigation.

Such litigants will be supported and supplanted by lawyers and law firms who often fund the cost of the litigation through contingency fee contracts because it is in their own self-interest. In the words of Justice BLACK:

"The only defense offered in the books, for decisions of overrulement effective for the case at hand plus future causes of action, is that otherwise there will be no incentive for appeals which, even though successful in overturning an outmoded rule, will result in no benefit to the appellant. * * *

"With the dictum and its supporters I disagree. It discloses some little unfamiliarity with the resourcefulness of skilled lawyers and with what really goes on in the offices of modern law partnerships. Gauging risk against chance with care, deft counsel are always willing in selected cases to take appeals in the hope of changing generally if prospectively some rule which should be changed in the interest of justice and necessary growth of the law. Such counsel usually find that one intentionally risked loaf, when cast with timed care upon picked legal waters, is likely to bring multiple and worthy results even though the appellant—expendable or not expendable—is set down without day." *Williams*

*v Detroit,* 364 Mich 231, 283-284; 111 NW2d 1 (1961)
(BLACK, J., separate opinion.)

This objection also assumes that the ground-breaking decision will always arise in the context of a single-issue appeal. We see no basis for this assumption and, in point of fact, appellants here sought reversal of the jury verdict on two other grounds.

The second obstacle raised against prospective application is that the Court's language has no binding effect because it is merely dictum.

Realistically, we find insufficient persuasive force in this objection to deter us from utilizing the purely prospective approach even as we have in other suitable cases.

"Although the rule laid down for the future is dictum rather than holding, when the court indicates clearly that this rule will be applied by that court in future cases, it necessarily rises above the stature of *ordinary* dictum; from that time forward, no person would be justified in relying upon the old rule which the court has repudiated. Clearly this objective to the prospective rule which does not apply to the parties in the overruling case is grounded more on theoretical niceties than practicality." Note, *Limitation of Judicial Decisions to Prospective Operation,* 46 Iowa L Rev 600, 613-614 (1961).

Finally, it is difficult to imagine a more legislative-like decision of the Court. Therefore, for all of the reasons that legislation is made prospective, this decision also should be given prospective effect.

As an alternative basis for reversal, it is contended that the trial judge erroneously instructed the jury on the plaintiff's duty of due care. The judge instructed:

"Now, I want to instruct you jurors, that the Supreme Court has said that a so-called right of way is not an assurance of safety, and does not grant an absolute right of way under all conditions. The driver on the street who does have a so-called right of way is still required to exercise due care in driving his car, or her car, in view of the conditions as they existed at that time. The driver on a favored highway, the superior highway has a right to assume that other drivers will obey properly erected traffic signs, but you must keep in mind here that this accident is with an authorized emergency vehicle which had a right under certain conditions to violate an erected traffic sign. The driver on a through highway may not proceed blindly. *The driver is required to remain alert to hazards on the highway and to make reasonable observations of other drivers approaching the intersection and must keep such lookout ahead and to the sides of intersecting highways as a reasonably prudent careful person would do in order to discover possible dangers, and he must act carefully* with the same care that the ordinary careful and prudent person would act upon the existing conditions, that then existed." (Emphasis added.)

It is claimed that the underscored language is inconsistent with or not supported by Michigan case law and that the instructions on the whole were erroneous.

In *Krause v Ryan,* 344 Mich 428, 432; 74 NW2d 20 (1955), this Court declared that a favored driver (one proceeding with the right of way) may not

"proceed blindly upon the arterial, secure in the supposition that he can do no wrong. *He must remain alert to the hazards surrounding him and with which he is confronting others.*" (Emphasis added.)

In *Arnold v Krug,* 279 Mich 702, 707-708; 273 NW 322 (1937), this Court declared that although a favored driver need not "have his car under such control at each intersecting road that he may stop

at once and avoid collision with persons who may illegally come into his path", such a driver still must

*"keep such look-out ahead and to the sides and down intersecting highways as a reasonably prudent person would do in order to discover possible danger and must act carefully* upon the existing conditions." (Emphasis added.)

In *McGuire v Rabaut,* 354 Mich 230, 237; 92 NW2d 299 (1958), the trial judge had quoted the foregoing from *Arnold v Krug, supra,* in his instructions to the jury on the plaintiff's duty of due care. He had also added that the favored driver was "not required to look to the right because he has good reason to believe that he is protected from danger in that direction by the stop sign". This Court held that the trial judge's addition to the *Arnold* language was error, stating:

"The favored driver must make observation despite his favored status * * * and no device or sign will remove this burden from him."

The language used by the trial judge in the case at bar is consistent with and supported by this Court's pronouncements in *Krause, Arnold* and *McGuire, supra.*

*Lansing v Hathaway,* 280 Mich 87; 273 NW 403 (1937), and *Holser v Midland,* 330 Mich 581; 48 NW2d 208 (1951), both preceded *Krause* and *McGuire, supra,* and neither dealt with jury instructions such as those in the case at bar. The question in each case was whether a favored driver had been negligent as a matter of law. The Court did state in each that a favored driver has a right to proceed unless he or she should have noticed a

warning to the contrary. This statement and the challenged instructions in the case at bar, however, are not mutually exclusive. The two are opposite sides of the same coin—one expressing the favored driver's right to proceed and the other expressing that driver's constant duty of due care. The gist of both should be communicated to the jury.

That was done in the case at bar. The trial judge told the jury:

"It is the plaintiff's claim further that the defendant here, Mr. Ernst, must establish by convincing evidence *that the plaintiff knew, or should have known, of the approach of the police car under the circumstances that she was confronted with.*

"It is the plaintiffs' theory that at all times * * * [she] acted as a reasonable, prudent person would have acted under the same or similar circumstances * * *." (Emphasis added.)

The judge later instructed:

"What does the common law require of Patricia Placek? What did it require of her on that particular day under those particular circumstances. You take the facts as you find them to be on that particular day, and the common law says of her that she must drive her car, *she must operate her motor vehicle in the same manner that the ordinary careful and prudent person would have operated the vehicle under the same or similar circumstances.* I will reread what I have already read to you, and that is what the word negligence means. I am referring now to common-law negligence, in regard to Patricia Placek. When I use the word negligence with respect to her conduct I mean *the failure to do something which a reasonably careful person would do, or the doing of something which a reasonably careful person would not do* under the circumstances which you find existed on that date in this

case. *It is for you to decide what a reasonable careful person would do or not do under such circumstances.*

\* \* \*

*"So you take the facts as they are, and then you set up your own ordinary careful prudent operator, driver, and take the facts as they were at that time, and when I say the facts, I mean everything. I mean the roads, the rise, if any, the motor vehicles, everything, consider everything, and it is for you to decide what a reasonably careful person would do under those circumstances, and she is held to that degree of care."* (Emphasis added.)

Finally, the trial judge did instruct that the plaintiff was driving on a "superior highway" and that

"[t]he driver on a favored highway, the superior highway, *has a right to assume that other drivers will obey properly erected traffic signs* \* \* \*." (Emphasis added.)

These instructions fairly informed the jury of the plaintiff's rights as a favored driver.

It is also claimed that the only instruction regarding the defendant's duty of care was a reading by the judge of a statute which states that the driver of an emergency vehicle may proceed past a stop sign only after slowing down as may be necessary for safe operation, and that no reference was made to another statute which states that the driver of an authorized emergency vehicle is not relieved of the duty to drive with due regard for the safety of all persons using the highway.

The trial judge gave the following instructions regarding the defendant's common-law duty of care:

"Now, what do we mean by common-law negligence?

When I use the word negligence now, *with respect to
the defendant's conduct, I mean the failure to do some-
thing which a reasonably careful person would do, or
doing something which a reasonably careful person
would not do under the circumstances which you find
existed in this case.* It is for you to decide what a
reasonable careful person would do or would not do
under such circumstances.

"Now, in other words, the law, the common law did
not say that you and I have to drive a motor vehicle in
a manner so that we never become involved in an
accident. *What they have done is create what they call
a reasonably careful person, and when you drive a
motor vehicle, when I drive a motor vehicle, we must
drive it in a manner commensurate with that manner
in which you find a reasonably careful person would
have done under the same circumstances."* (Emphasis
added.)

The judge then read from and explained the
defendant's statutory duties:

"The driver of any authorized emergency vehicle
when responding to an emergency call but not while
returning therefrom may exercise the privilege set
forth in this section, but subject to the conditions
herein stated. * * * The driver of an authorized emer-
gency vehicle may: * * * park or stand irrespective of
the provision of this act, * * * proceed past a red or
stop signal or stop sign *but only after slowing down as
may be necessary for safe operation,* * * * exceed the
prima facie speed limits *so long as he does not endan-
ger life or property.*

* * *

"And so you have heard, as I read that statute, the
words, some general terms *which refer you back to this
rule of reasonableness that you heard when I explained
common law to you.* It speaks about slowing down as
may be necessary for safe operation. Well now, you can
see that that is for you to determine, for you to deter-
mine whether it is necessary, and if so to what extent it

is necessary. It picks no definite standard *except the standard of reasonableness* which says, 'may slow down as may be necessary for safe operation'. And when we have such words as 'safe operation' *you are to interpret that as meaning reasonable safe operation, because the rule of reason, of human judgment, is carried throughout the statute, the same as it is your conduct under common-law negligence."* (Emphasis added.)

Later, in the course of explaining the plaintiff's statutory duty to yield to emergency vehicles, the judge instructed:

" *'This section shall not operate to relieve the driver of an authorized emergency vehicle from the duty to drive with due regard for the safety of all persons using the highway.'*

"Now, you will run into those words, *'With due regard for the safety of all persons using the highway.'* Now, due regard, again, what do we mean by that? *We mean that regard, that care which the ordinary person and prudent person would have exercised under the same conditions as then existed."* (Emphasis added.)

These instructions fully and fairly informed the jury of the defendant's duty of care; therefore, we find no reversible error.

## CONCLUSION

We advocate prospective application because, on the facts of this case, considerations of judicial administration, stare decisis and justice to all similarly situated persons outweigh a judicial inclination to seek application of an overruling decision retroactively. Implementation of pure comparative negligence will not be easy under any approach. The necessary adjustments to shift from a contributory negligence system to a pure compara-

tive negligence system are numerous.[11] Indeed, some inconsistencies between the two systems can only be eradicated by the Legislature.[12] However, there is no question that the administrative problems inherent in prospective application of comparative negligence are eclipsed by the difficulties and disruptions willingly invited by the majority.

The primary reason for the development of the prospective application doctrine is that it provides a viable alternative to choosing between the disruptive effects of retroactivity and perpetuating outmoded law. Stability and development are en-

---

[11] The number of substantive and procedural questions which must be resolved are troubling. For example:

1. What should be the role of the doctrines of last clear chance, avoidable consequences, assumption of risk, and sudden emergency in a pure comparative negligence system?

2. What is the proper standard for judicial review of the jury's apportionment of negligence?

3. Procedural questions on joinder of parties, impleader, compulsory counter- and cross-claims, and affirmative defenses are raised.

4. The multiple tortfeasor situation has numerous ramifications, including joint and several liability, contribution, releases, indemnity and when one tortfeasor is uncollectible or immune from suit.

5. Questions concerning set-off, which vary when liability insurance is involved, abound when cross- or counter-claims are raised.

[12] The Legislature has already implemented pure comparative negligence in the products liability area. 1978 PA 495, MCL 600.2949; MSA 27A.2949 reads:

"(1) In all products liability actions brought to recover damages resulting from death or injury to person or property, the fact that the plaintiff may have been guilty of contributory negligence shall not bar a recovery by the plaintiff or the plaintiff's legal representatives, but damages sustained by the plaintiff shall be diminished in proportion to the amount of negligence attributed to the plaintiff.

"(2) If the court determines that the claim or defense is frivolous, the court may award costs and reasonable attorney's fees to the prevailing party in a products liability action."

Of particular concern is the present statute providing for contribution between joint tortfeasors on a pro-rata basis. MCL 600.2925a; MSA 27A.2925(1). The legislation is inconsistent with a pure comparative negligence system. RJA, § 2925b(a) reads:

"In determining the pro rata shares of tort-feasors in the entire liability:

"(a) Their relative degrees of fault shall not be considered." MCL 600.2925b; MSA 27A.2925(2).

hanced through its utilization. It would be difficult to conceive of a situation more akin to legislation and thus more ideally suited for prospective application than the instant case.

Our colleagues have chosen a limited retroactive application. The problems of administration, procedure, and court congestion aside, this course is unjust. Because one plaintiff's counsel gambled on our holding today and its retroactive application, while another plaintiff's counsel followed the existing law and, finding no error, did not go through the motion of "preserving" error, comparative negligence will be applied in the former case while contributory negligence bars the latter cause of action. We cannot justify nor can we support such unequal treatment. In our view, the choice is distinct. Neither can we support the disruptive effects inherent in the majority's sudden retroactive application of such a pervasive change in our tort law.[13]

We also dissent from the finding of instructional error regarding the duty of care.

We would affirm the trial court without costs to either party. Pure comparative negligence should be applicable to all causes of action accruing after the effective date of this opinion.

FITZGERALD and RYAN, JJ., concurred with COLEMAN, C.J.

---

[13] We approve of the material contained in the appendix to the majority opinion.